**Nick LAMPSON, Jefferson County Tax Assessor-Collector, Appellant,**

v.

**SOUTH PARK INDEPENDENT SCHOOL DISTRICT (Successor In Interest To Beaumont Independent School District), Appellee.**

**No. 09–84–299 CV.**

Court of Appeals of Texas, Beaumont.

Sept. 25, 1985.

Rehearing Denied Oct. 16, 1985.

Carl A. Parker, Port Arthur, for appellant.

Tanner T. Hunt, Jr., Beaumont, for appellee.

## OPINION

PER CURIAM.

This appeal involves a contract[1] between Jefferson County (the Jefferson County

---

1. The salient paragraphs of the "Contract for Assessment and Collection Services", dated September 8, 1982, were:

    "*III. Service to be Performed*

    "1. The County shall collect the ad valorem property taxes owing to the District. The County further agrees to perform for the District all the duties provided by the laws of the State of Texas for the collection of said taxes.

    "2. The County shall perform all the functions set out in the definition section of this contract. Specifically, the County agrees to prepare consolidated tax statements for each taxpayer. The tax statement shall include taxes owed to both the County and the District, or either, as the case may be. The County shall mail said tax statement to each taxpayer.

    "3. The District hereby designates the Assessor-Collector of Jefferson County as its tax assessor for the purposes of compliance with Chapter 26 of the Texas Property Tax Code, as amended. In addition, the parties agree that the assessor-collector of the County shall perform all the duties required by law of the tax

Tax Assessor-Collector) and the South Park Independent School District, successor in interest to the Beaumont Independent School District. The Tax Collector was to have performed and completed the contract. The Appellant contends that the trial court erred in granting against him the writ of mandamus sought by appellee. Appellee contends the writ of mandamus was necessary to motivate Appellant to perform certain duties and requirements of the intergovernmental agreement. We will attempt to summarize the events leading up to the granting of the writ. We will begin with the testimony given by County Auditor, Jerry Ware.

## WARE'S TESTIMONY

Jerry Ware had served as County Auditor for 3 years, having been appointed by the District Judges. He has a B.B.A. degree in accounting from Lamar University. It is his responsibility to audit the records of the Tax Assessor-Collector; examine the accounts; verify the accuracy of the reports that are generated by the Tax Collector. At the date of trial, Ware could not estimate the necessary additional time required to fulfill the contract. He had made such estimates in the past. He had been wrong. His office had verified the accuracy of the collections reports from November 1982 through September 1983. He had verified the accuracy of the delinquency tax collections reports from July 1982 through June of 1983. Ware verified the data from November 1982, which was the first month of collection of the 1982 taxes, through September 1983—being the 1982 tax year for *current tax collections* only. Pertaining to the *delinquent tax collection*

assessor-collector of the District in regard to assessing and collecting ad valorem taxes.

"4. The District agrees to promptly notify the County of the adoption of any residential homestead exemption not automatically imposed by law. Further, the District will promptly notify the County of the adoption of any of the provisions contained in Sections 26.011, 31.03, or 31.05 of the Property Tax Code, or of the adoption of any other provision under law which would affect the assessment or collection of taxes for the District.

"5. The County agrees to mail tax statements by October 1 of each year, or as soon thereafter as practicable.

"6. The County shall provide for taxes to be collected at the Courthouse in Beaumont.

"7. The County shall furnish to the District the following:

"(a) A duplicate of the current tax roll showing: gross value as certified by the Appraisal Review Board of Jefferson County; exemptions; frozen taxes; and the tax levy as calculated using the District's tax rate. The total tax levy shown shall equal the amounts shown on all tax statements mailed to taxpayers. This document shall be delivered to the District by October 31 of each tax year, or as soon thereafter as practicable.

"(b) A duplicate of the prior year's current tax roll as it exists on August 31st of each year, together with a report reconciling the beginning tax roll less collections and adjustments to the ending tax roll. This shall include the apraisal [sic] value and exemptions as well as the tax levy and should be provided by September 30 of each year, or as soon thereafter as practicable.

"(c) A report showing delinquent taxes for each year as of August 31, as required for the District audit. This shall be furnished by September 30 of each year, or as soon thereafter as practicable.

"(d) A taxes receivable summary each calendar month showing unpaid current taxes and unpaid delinquent taxes at the end of such calendar month. Each summary shall be furnished by the 10th day of the month following that to which the summary pertains, or as soon thereafter as practicable.

"(e) A monthly status report of collection activity. Each report shall be furnished by the 10th day of the month following that to which it pertains, or as soon thereafter as practicable. Each report shall show separately for current and delinquent taxes: the beginning of the month taxes receivable; less collections; plus or minus adjustments; to equal the month ending unpaid balance of taxes receivable. This shall be shown in two columns, or in two (2) reports, one showing the month's activity and the other showing school fiscal year-to-date activity. Each report shall include a reconciliation of collections to the cash transfer to District's Depository for the month. Further, each report shall show the breakdown of collections into current taxes, current penalty and costs, delinquent taxes, delinquent penalty and costs, interest, and other tax related revenue. Further, each report shall show legal activity taken on District accounts during the month, including suits filed, judgments taken, judgments paid, and Sheriff's sales.

"8. All annual reports of delinquent taxes required by III, 7 hereof, shall first be due in the year 1983 on the date stated.

"9. The County shall mail a delinquent tax notice to each delinquent taxpayer by March 1 and again by July 1 of each tax year."

records, Ware's office had verified the accuracy of that data from July 1982 through June of 1983.

Ware testified that, concerning the District reports, the only data lacking before he could audit the final delinquent tax roll was the reconciliation of "Form 18", the report of delinquent 1982 taxes as of June 1983. The postings of the collections for July and August of 1983 were also needed. He said it may or may not take an additional 6 to 8 weeks from late February 1984 to complete the work.

Then Ware went down a list that the Court, through a "Stipulation",[2] had ordered Lampson's office to furnish to the school. The first item was an accurate, current tax roll to be delivered to the school district. Ware testified that he believed that the current tax roll had been prepared but he did not know whether or not it had been furnished to the school district. He thought that it was probably in an auditable form but had not been actually audited. Ware stated that he would usually look at the current tax roll but he would not have the ultimate responsibility of the actual audit. Apparently at this point Lampson was personally in court with some reports.

The next stipulated item was to supply the school district with an accurate, current tax roll for the year prior, together with the report accurately reconciling the beginning tax roll and including the appraisal values and exemptions as well as the tax levy. On this item Ware said it was his understanding that there had been changes on that roll. On that tax roll, Ware said that Lampson told him there were actually two different rolls; one based on the original values from the appraisal district and the other based on the tax rolls used to generate the statements. Also, Lampson had a reconciliation of the two to show what those changes of the values were. In layman's words, Ware said that Lampson's reports in hand the day of the trial were going to show both values—one, the appraisal district values; and two, the values that Lampson's office applied. There was to be some nature of reconciliation. Ware understood Lampson had a reconciliation available the morning of the trial.

Item "c"[3] was to furnish to the school district a complete and accurate report as to the status of delinquent taxes. Ware testified that he had not reviewed it. This item had not been supplied by Lampson and the elements necessary to provide this report have not been completed. The majority of the component, elementary parts of this report had probably been completed,

2. The crucial, operative paragraphs of the "Stipulation", dated January 10, 1984, were:

"a. Furnish to the said school district an accurate current tax roll.

"b. Furnish to the said school district an accurate current tax roll for the prior year, together with a report accurately reconciling the beginning tax roll, and including the appraisal value and exemptions as well as the tax levy.

"c. Furnish to the said school district a complete and accurate report as to the status of delinquent taxes.

"d. Furnish to the said school district for each prior calendar month, a complete and accurate taxes receivable summary reflecting unpaid current taxes and unpaid delinquent taxes at the end of each calendar month.

"e. Furnish to the said school district complete and accurate monthly status reports of collection activity containing calculations showing, for both current and delinquent taxes, beginning-of-the-month taxes receivables, less collections, plus or minus adjustments to equal the month ending unpaid balance of taxes receivable, reconcilable with cash transferred to reflect legal action taken on plaintiff's accounts during each month, including suits filed, judgments taken, judgments paid, and Sheriff's sales.

"f. Notify the said school district as to whether delinquent tax notices were mailed by March 1, 1983 and again by July 1, 1983;

"g. On more than one occasion, to remit collections in excess of $5,000.00 to plaintiff's depository prior to 2:00 p.m. of the following banking day;

to the manifest injury to plaintiff school district herein, and that plaintiff has itself performed in accordance with the terms of that contract.

"However, defendants aver that they are diligently at work in an effort to perform all of the aforesaid duties, which they intend to complete within thirty (30) days of this date."

3. The items identified by small alphabetical letters refer to identical paragraphs in the "Stipulation" and Court's "Order", both dated January 10, 1984.

but some had not. Hence, the report has not been finished.

Ware testified that Lampson had assumed the responsibility of assessing and collecting taxes for several governmental entities, about 14 in number, other than the county and the school district. The list included the City of Beaumont, the Port Arthur School District, Drainage Districts, Navigation District and others. All these taxing agencies were in exactly the same posture and position as the school district.

Item "d" was to deliver to the school district for each required calendar month a complete and accurate tax receivable summary, reflecting unpaid current taxes and unpaid delinquent taxes at the end of each calendar month. These reports had not been furnished and, in Ware's opinion, they cannot be provided in that particular form. But the tax office ought to be able to provide "reports of delinquent collections." The tax office should be able to report what delinquent taxes were due each month and the monthly delinquent tax collections. This would require manual computation by going back and taking the delinquent tax record and subtracting out the collections for each month and determining each month's end receivables. Manual computation, Ware said, was the only method that could be used. Manual work would take time.

Ware testified that if the tax office had done its work timely then it would be possible to have those detailed reports. But it may not now be possible. Perhaps extensive manual work could correct the situation.

Item "e" was to "furnish the School District complete and accurate monthly status reports of collection activities containing calculation showing for both current and delinquent taxes, beginning-of-the-month taxes receivables, less collections, plus or minus adjustments to equal the month ending unpaid balance of taxes receivable, reconcilable with cash transferred to reflect legal action taken on plaintiff's accounts during each month, including suits filed, judgments taken, judgments paid, Sheriff's sales."

Ware testified that they were back to the same problem of generating reports showing a beginning and ending receivable. The reports under item "e" cannot be accomplished by electronic means. The tax office can report the collectibles of each individual month but for the county's computer to go back and determine what those beginnings and endings receivables were for those particular months cannot be done. Again, that data would have to be done through manual computation, requiring time.

The computer cannot be the culprit in this matter; it cannot be the scapegoat. The computer is a piece of equipment that is programmed by individual persons. The entry of the data into the computer would be the responsibility of the tax office, changing it from conventional form into electronic form. It is the tax office's responsibility to enter that date correctly into the computer. Then the computer would correctly maintain that data electronically. Ware said one can't just say that the computer got messed up; that's not correct. That's a convenient excuse but will not stand. Also, the computer was made available to Lampson on all necessary occasions. There has never been any refusal on Ware's part, or on the part of the data processing department, declining to provide access to the computer or refusing to program anything that was requested by the tax office. Ware conceded the responsibility of the computer, after entry, and the allocations for its ultimate use, would be under the jurisdiction of the County Auditor. There are data processing managers and programmers for data processing. The first line of responsibility would be that of the programmer to work along with the tax office to generate the print-outs and to produce the programs in accordance with the tax office's request.

Item "f" was to notify the school district as to whether *delinquent tax notices were mailed by March 1st and again by July 1st of 1983.* Ware had no knowledge on

this item. That task was the tax assessor-collector's sole responsibility. The county auditor's office had no involvement.

Item "g" was to remit collections in excess of $5,000 to the school district's depository prior to 2:00 p.m. on the following banking day. Ware testified that he did not know if this had been done or to what extent. This information would be impossible to ascertain without a complete analysis of the collections compared with the deposits. Simply stated, when Lampson had collections in excess of $5,000 belonging to the school, did he make such deposit prior to 2:00 p.m. on the following banking day? Ware could not testify as to this and he did not know how a complete analysis of these collections for certain days could be accomplished.

Ware testified basically, from an accountant's point of view, the school district needed these financial reports. No one can prepare financial reports without knowing what the collections are for a particular reporting period. A school district would have to know about these deposits timely so that it knows the money collected is proper and accurate and is its to keep. Without these various financial reports independent auditors cannot express an opinion. If one is a financial officer for an independent school district as of the fiscal year ending August 31st, and one finds himself in late February of the following year still in an unauditable position, what does that do? Ware said: "I'm in the same position as the County Auditor, Chief Financial Officer of Jefferson County, because our fiscal year ends one month later than the school district. We do not have the information that we need to complete our financial report."

We do not perceive Ware being uncooperative. Ware said that what compounds the school's problem is that the district's financial administrator has certain Texas Education Agency guidelines which must be met and which the county auditor does not have to meet. The county auditor does have to make these reports to the District Judges or to the County Commissioners.

Ware continued that this puts the county, the delinquent taxpayer, and the current taxpayer—but especially the delinquent taxpayer—in a difficult position. For example, if the taxpayer is a homeowner and wants to sell his house or other land and he wants to receive a tax certificate showing all taxes paid on that property; then, without the proper documentation that these taxes are paid, it is difficult for the tax assessor-collector to issue a certificate with certainty. If a certificate is issued for the taxpayer, with taxes unpaid, then it becomes the county's liability.

Ware was asked what was the difficulty on the trial date. Ware answered, in summary: In the beginning, November of 1982, a tax roll was received from the appraisal district. There were 3 major obstacles which showed on the face of that tax roll. No. 1, that tax roll should have been provided to Jefferson County in July of that year, but it was not delivered, Ware thought, until October or later. No. 2, the county tax assessor's office began collecting taxes not only for the county, the drainage districts, and the port district, but also some very large entities, such as the Beaumont Independent School District, the Port Arthur School District, the City of Beaumont, and also began the process of converting to an automated system. The automated system had not been properly developed when the time came to start collecting the taxes so, therefore, it was impossible to maintain the proper control over these collections. Next, when the auditor's office began the reconciliation process, it found that some values (taxable values) had been changed. The values of the appraisal district and the values used by the tax collector were not the same. Therefore, the auditor's office could not balance these beginning rolls even though a tremendous amount of time had been spent attempting to reconcile these rolls.

Ware testified that certain taxpayers went to the tax office saying they were entitled to certain tax exemptions that the appraisal district had not recognized on the tax rolls. To handle that matter correctly,

the taxpayer should have gone back to the appraisal district and had the exemption approved if it was a true exemption. Later the appraisal district would make the proper change in the tax roll. But the tax collector's office chose, at an early stage, to allow some of those exemptions. The tax office collected a different amount of tax, based on a different value than had been certified by the appraisal district. In some instances the appraisal district subsequently agreed to the changes, but there was a lack of procedure. These changes were not kept up with properly. Thereafter, some of the governmental entities lost interest because the remittances were not made timely and the districts did not know where they stood in respect to the status of delinquent taxes. The school district probably does not know whether it was long or short with respect to either delinquent or current tax collections. And, as to what the school district did receive, it doesn't know if the amount was too much or too little; this has not been audited.

Again, Ware expressed the opinion that the determination of the amount of delinquent tax receivables was what the school district needed for its financial reports.

As to the school district, the beginning of the collecting of taxes was based on the appraisal district's rolls. There had been a verification of the collection report on delinquent taxes from the day that these taxes were collected for the school district through June 30, 1983. On the current collections, the auditor had made a verification of the current collection reports through September of 1983. But what hasn't been verified is the determination of the amount of delinquent taxes of the 1982 collections.

Ware stated there exists a current collection system and a delinquent collection system. The 1982 delinquent taxes are not in the delinquent collection system for posting. We cannot, therefore, at this point, determine what those delinquent 1982 taxes are. The auditor's office was trying to reconcile the component parts of the delinquent 1982 taxes, and had been working on

that for at least a month to try to determine what those 1982 taxes were. Ware didn't know how much longer it would take. His office had worked on it all that weekend (before trial) but there were differences and he was not sure how to proceed or how to find where they were out of balance. The auditor simply did not know what the delinquent taxes were for 1982. Since he could not determine what the delinquent taxes were for 1982, he simply could not finish the delinquent tax receivables for the year 1982 and file the same in the computer.

Ware testified that his staff, after working all weekend long, were at an impasse. The ones who worked that last weekend needed some input from some other people—some of the data processing people. But they were not in a stalemate. Ware said he thought he would continue to make progress and eventually accurate reports for the district would be available.

Ware gave evidence that the auditor's office had not had a chance to check the tax office records as to the process of balancing the collection reports for certain periods to the deposits that were made to the accounts; and until he had the full reports of collections and distributions, he could not say whether what he received was an accurate account or not.

Ware was asked if the cash deposits made to the depository bank for the school agreed with the tax roll on a month to month basis. Ware said he wasn't sure about that at this point. The purpose of that information was to determine whether South Park received the correct money it was supposed to obtain or whether it got more or less money. That had not been determined. Ware had written a letter apparently in May or June of 1983 in which he made reference about lack of internal control in the tax collector's office. He explained that "it is basically a lack of established procedures for collecting and remitting those taxes." There were no set procedures for that.

Ware stated there was a lack of established procedures for collecting and remit-

ting taxes; that internal control extends to separation of duties which would make sure that one particular clerk would not have access to the full cycle of the collection process; that is, the way the money flowed into the tax office through the mail and then deposited in the bank at the time it was finally disbursed. There should have been a proper separation of duties through those different processes and established procedures for handling those collections. There was a *serious violation of internal control in the use of unnumbered tax receipts and this lack of internal control extended for the contract period and even up to the date of trial. Ware said that, although his office tried to tighten up the controls, he didn't think that every internal control that had been recommended as necessary had been established.*

Then, Ware was asked if the school district could get what it contracted for as a governmental entity. Could it get a clear financial picture? Could it get an auditable product without the internal controls? Ware answered he thought it would be auditable but not to the degree where the independent auditors of the school district could give a clean, clear opinion on a financial report. The independent auditors would probably give a qualified opinion, reading something like "these financial reports fairly represent the financial information except for the collection of the figures of current tax collections and the receivables". This would result because of the lack of procedures and internal control in the tax office during the period in dispute. *Upon questioning, Ware stated that he thought that the history of Jefferson County was going to report that there was a period of about eighteen months or so when sixteen of its governmental entities had a pretty good guess as to where they stood financially but they were not really certain. Ware said he thought that was a fair statement.*

Ware testified that he had heard there was a man named Broussard who signed Lampson's name to checks in the tax collector's office. In fact, that he had heard Mr. Lampson say that Broussard had signed those checks in the past. There was no objection to this testimony. Ware said that Lampson admitted, in the past, that Broussard had signed the checks for him. These checks were written out of the collection account and disbursements were made to the South Park School District. Impliedly, Ware disapproved from an accounting point of view.

## CROSS–EXAMINATION OF JERRY WARE

Ware admitted that he did not know of *any law* that prohibited a tax officer from deputizing someone to act in his behalf and to sign checks.

Ware denied that there had been an attempt to ·convert a manually kept record system to an automated collection process. Ware said that the attempt was made to actually begin collecting taxes with an automated system. The attempt was to start out with the year 1982, but there was no conversion as to that year. There was a conversion as far as a prior year was concerned. Ware admitted that the conversion had caused problems. *Ware insisted that the county had a computer that was adequate to perform the duties, all of the duties, of the tax collector.* Ware said the problem with the county's computer generating reports required in item d is that "you can't go back and determine a receivable at the beginning of that month when the receivable was continuously changed by the tax office."

One reason for this was the granting of exemptions prior to the time they were approved by the appraisal district without any documentation of those changes—the changes apparently being made in the tax office. Therefore, it became impossible to go back and reconstruct a receivable where undocumented changes had been made to that receivable. Certainly the computer could not do that. That would be impossible because a computer cannot converse and carry on a conversation with a Jefferson County taxpayer.

Ware testified that the tax collector does not have the discretionary, policy making power to bill taxes based on an amount or valuation different from the amount or valuation set by the appraisal district.

Ware conceded that even if Lampson had every bit of the data in accurate form in his possession at the time of the trial, then, he could not, acting alone, deliver that data to the school district in the form demanded and contracted for because he would have to have the assistance of the Data Processing Department and the persons therein who actually knew how to operate the computer equipment. Ware was in charge of the Data Processing Department.

Ware testified, under agressive cross-examination, that everybody in his department was working directly on this problem with the exception of 3 people. Those 3 people were in the courtroom.

Ware testified unequivocally that, since the court entered the order of February 13th, he had worked in conjunction with the employees of the tax office to provide this information and that his staff had been cooperative. Ware conceded that he had never heard the tax collector say that he (the collector) would not furnish any of the desired tax information to South Park. Ware admitted that he could "prioratize", in his discretion, the orders laying out the work for data processing but that he had given the *data processing first priority in connection with the South Park District demands.*

Ware conceded that a tax office employee, with experience, could manually check the tax status for the issuance of a tax certificate. Ware conceded that the Tax Collector had tendered some tax information to South Park—some was accepted and some sent back as unacceptable. Ware said he had advised South Park officials that "everybody was working diligently" on their problem and that Lampson, himself, and other employees had worked through the weekends in an attempt to produce the information in the form requested. Ware averred that he had people from his office assigned to the tax office to work on weekends, from time to time, saying he followed the requests of the Tax Collector.

Ware agreed, on cross-examination, that, as auditor, it was a part of his duties to examine closely the affairs of the county and the procedures for keeping track of money and expenditures and that it was his duty to help the tax department to do better. Ware responded that he had sent many letters to Lampson making suggested improvements; he claimed that he had sent many letters setting out procedures that needed to be established for tax collections. He agreed that he had written several letters and that he wrote about "whatever is hot today", stating "there's so much that needed to be done."

There was a letter that Ware wrote to Jones, who was the financial officer of the school district, which did contain some broad condemnation or criticism of the internal procedures of the tax assessor's office.

Ware testified, on redirect, about a letter he had written at the request of Mr. Charles King, a certified public accountant, who is one of the independent auditors for the school district. The requested letter was to contain the current status of the preparation of information, the reconciliation efforts of the county auditor with those of the tax office, and whether those financial records could be audited by the independent auditors, so that they could express an opinion on the financial report; stating, in the opinion of Ware, "that until Jefferson County internally *completes the reconciliation of tax collection records, restoring those records to an auditable condition, any effort of an independent auditor of any entity for which the Jefferson County Tax Office collected 1982 taxes would be futile.*"

There was a letter from County Judge LeBlanc dated June 3, 1983, which was a response to a letter from Tom Jones, Superintendent of Finance, concerning the reconciliation efforts and the providing of collection reports to the school district.

There was a letter from Ware to Lampson, dated September 29, 1983, expressing his concern about the delay in the reconciliation of the 1982 tax collection records. Ware testified that the lack of these financial reports would have an adverse effect on the bond rating of the district. He then related the bond rating process. Ware again verified that Lampson, on numerous occasions, verbally and in writing, declared that he, Lampson, was undertaking to perform the duties spelled out in the contract; that he had accepted those duties, had undertaken to perform them, and was moving forward on them.

Ware further testified that there was not any information contained in any of the letters he had written to the school district that had not already been brought to the attention of Lampson.

Under questioning by the trial court, Ware swore that from October of 1982 through December of 1982 he and his staff had little contact with the tax office relating to the school district's problems, but in the following January the auditor's office found some discrepancies in the valuations and the changes in taxable values and that was when the tax office tried to reconcile the tax records.

After the problems were discovered and up until the time the suit was filed, Ware testified that his office had about 30 or 40 conversations with Lampson personally, in relation to fulfilling the obligations under the contract. Ware said the awareness of the tax office problem started because of certain letters from the school district to the county judge. The first problem was the fact that the bank statements didn't reconcile, which was a serious problem within itself. The changes that were made to the values, the lack of internal controls, issuing unidentified, unnumbered receipts and temporary receipts, and the failure to follow the procedures established by the Data Processing Department deepened the crisis. Many problems coalesced at one time. These occurred generally in January, February and March of 1983.

Ware said there were times he felt, from January through March of 1983, that he wasn't getting the necessary cooperation from Lampson's office that was required because of the multitude of problems that had been discovered. But, since about July 1983, there had been a feverish level of activity to comply with the contract, even through the date of trial, February 1984. This included working weekends.

There was a slight financial reward to Jefferson County which was that the entities were billed 20 cents per parcel or 20 cents per account for the work done by the tax office. Ware did not believe this was an ultimate financial benefit because of the increased cost of the operation. Ware had received a copy of the letter from the school district demanding the payment of lost interest and additional accounting fees.

Ware testified that during a meeting with the City of Beaumont, the City insisted that it be paid lost interest. He had not heard from the other 14 entities involved.

## TESTIMONY OF THOMAS F. JONES

Thomas F. Jones was the Assistant Superintendent for Finance for the School District. He has held that position for 18 years.

Jones was the only other witness. Jones identified the contract between the school district and Jefferson County. He characterized it as an agreement between the parties for the collection of taxes in an acceptable fashion, providing that the Tax Assessor-Collector "shall perform all of the duties required by law of the State of Texas of the Tax Assessor-Collector of the district in regard to assessing and collecting ad valorem taxes." He further testified that Lampson and his office would stand in the shoes of the Tax Assessor-Collector for the school district and perform the functions of that office and that the contract called for an "accountable tax roll" for all collections done by Jefferson County. Jones testified that under the law an "accountable tax roll" results after you take the adjustments minus collections from the original tax roll resulting in a roll

at the end of the year that would become the delinquent roll. He said after the contract was signed, the tax roll would be furnished by the Jefferson County Appraisal Unit to the county.

The school district formerly had its tax collections done by the City of Beaumont. The collectibles at the City had become delinquent and that delinquent roll was to be transferred from the City to Jefferson County. That included the taxes for 1981 and prior years. The Jefferson County Appraisal Unit didn't get the roll to the tax office until November or December of 1982. Lampson's function was, on the basis of that roll, to collect both delinquent and current taxes and remit same to the school district. When a taxpayer came in and paid, those taxes were to be deposited to the school district's account in the bank with no delay. Then, there was to be a report of that collection through a procedure to the business office of the school district.

When Jones was asked what went wrong, he answered: "In practically all areas it went wrong." Jones testified that the school district was to be furnished a roll by the county, not the appraisal district. They received a roll from the appraisal district and a roll from the county but the rolls didn't match in the total value. That occurred in December 1982, just a couple of months after the work under the contract began. The school district received a list of parcels from the appraisal district with certain values assigned. Then it received a list from Lampson's office with values assigned. There were discrepancies. Jones said that Lampson had apparently changed the values. Jones testified that the school district's basis of collection had to be based on what the appraisal district established as values for the district. This was necessary to make an accountable tax roll. Any adjustments had to emanate from the appraisal district. Some adjustments would result from people over 65 who had not claimed their exemptions, errors in the roll, contested values, etc. But, Jones stated, when the taxpayer feels an adjustment or exemption is due him, he has to go back to the Central Appraisal District and the Appraisal Review Board has to make those adjustments once the tax roll is established. Then, if it is proper, either the adjustment or the exemption takes place by the Appraisal Board's sending a correction to that roll to the county. That, in turn, is forwarded to the school district so it will have an accountable roll throughout the different tax years. Thus, the school district simply could not have an accountable tax roll because it started with two different values— one from the appraisal district and one from the tax collector's office.

The law was clear that the values were not to be changed except by the Jefferson County Appraisal Board. Jones testified that those differences had not been corrected, even at the date of trial. As of that date, the district still did not have a reconciled current tax roll for the 1982 tax year.

Jones testified concerning the problem with the delinquent tax collections under the contract. He stated that one of the bases for good delinquent tax collections is billing twice a year, in March and in July. Jones stated that the district didn't know whether that had been done for all of those prior years to keep "pressure on delinquents." He said the district didn't know whether the billing twice a year had taken place or if any demand letters had been written to delinquent taxpayers. He said that was one of the services to be specifically performed under the contract and it had not been done.

Jones testified that the last tax roll he had seen was the 1982 roll printed out by the City. He said the district did not have a record of the delinquent taxes, prior to 1982, collected by Lampson since the beginning of the performance on the contract.

Jones averred that there had been no up-date on the delinquent tax roll with which the district could work. They did have a 1981 roll printed out that had "paid" marked on the side of some of the accounts; but, in that form, it was almost unusable without a tremendous amount of

work and that the district should have received a computer-oriented roll under the contract.

Jones said they were unable to establish fund balances at the end of the year. *He did not know how much money was properly the district's and what monies possibly belonged to someone else.* He testified that, if there was any question about the careful handling of monies, it would certainly affect the district's bond rating and, since the district was facing a new tax year, it would adversely affect their ability to set a tax rate inasmuch as the rate would have to be estimated and consequently might cause the setting of a too high or too low tax rate.

Jones testified that as they moved into the 1984 year, the more serious the effect this problem would have on the district's financial situation. Jones maintained that beginning in January 1983, there was a flow of information back and forth between the school district and the tax office. *Two of the school district's accountants were working with the county tax office to assist in resolving the problems;* however, few results were received. Then, Jones said he wrote letters directed to Judge LeBlanc with carbon copies to everyone involved. But the district still did not get the monthly reports that were necessary as called for in the contract—neither the current tax nor the delinquent tax reports. Jones testified that he had met with Lampson, members of the Commissioners Court, and Ware as a group on one occasion and that he had met with Lampson at the beginning of the year on at least two occasions. There may have been other meetings. There were telephone conversations between Jones and Lampson. There had been continuing pressure and expressed concern almost from the outset of the contract beginning in December 1982. This continued throughout the one year contract term.

Jones testified that the district was being billed about $5,000 for necessary extra accounting fees in connection with the problem; it still didn't have an audit; their

independent auditors were not finished. There was due about $55,000 that the district had been billed for accounting fees.

Jones swore that Lampson had never denied, either to Jones or the Commissioners Court, that he (Lampson) did not believe it was his duty to perform the various aspects of the contract.

## CROSS-EXAMINATION OF JONES

Jones verified that he had never heard Lampson say "I am not going to furnish you anything" and stated that Lampson had complied to some extent and sent some material to the school district. His main complaint was the quality of some of the reports sent. Jones admitted that some of the reports were to be made to the school district on certain dates "or as soon thereafter as practicable", which he interpreted to be a reasonable time. But Jones said he thought the reasonable time had expired after one tax year had gone into another tax year. Jones testified that the school district has not tried to issue any bonds since 1982 and there was no bond issue pending at date of trial. The school district had outstanding bonds, but no bond holders had contacted the school district to express any concern about the financial situation. Jones further admitted that setting the tax rate is not an exact science—that it is an estimate—and sometimes you hit and sometimes you miss.

Jones said his district had received about $12,000,000 from the county tax office and that *there was a possibility that the county had overpaid the district, which could be in a significant amount.* However, Jones did not know if the school district had been overpaid or underpaid. Jones said "At one time they sent us three hundred and something thousand dollars more and asked for that money back" and the school district refunded that amount to the county tax office.

At the time of negotiating the contract, Jones and two accountants observed the new computer in operation and they talked to people in the tax department and the data processing department. Jones was

under the *impression that the tax collector had some control over that computer*, at least enough to do the work necessary for his department.

Jones testified that when he was complaining of the quality of Lampson's work, he was using the word "quality" with the same meaning as the word "accuracy" and that the contract called for accurate reports. If the district received inaccurate information, it was the same as having not received anything. Jones further stated that the district would not have entered into the contract with anyone who promised to furnish the requested information unless it was delivered on time. The school district would not have agreed to receiving the information in the following fiscal or tax year.

Jones averred that the "box of stuff" delivered by Lampson in January, prior to trial, being a roll of delinquent tax accounts, was simply not usable. The notations were made in longhand as to what had been collected, but the roll was not what the contract called for and the school district returned it to Lampson's office. Jones further stated that a report received late on the afternoon before the trial had a beginning balance on one of the reports that was out of balance approximately $1,400,000. Jones felt it was Lampson's responsibility to reconcile that difference.

Jones stated that he called the school district's attorney for assistance in preparing a letter to Mr. Nick Lampson, dated January 12, 1984, outlining the reasons for returning the reports sent to the school district. This letter was introduced into evidence without objection. Ware and Jones were the only witnesses. Neither Lampson nor anyone from the tax office took the witness stand.

## THE PLEADINGS

The record reflects that the school district filed an original petition for writ of mandamus against Lampson, in his official capacity as Tax Assessor-Collector of Jefferson County, the County Judge in his official capacity, and the four county commissioners in their official capacities. The District alleged that there existed an intergovernmental contract with the County and Lampson for assessing and collecting taxes. This contract was entered under the aegis of *TEX.TAX CODE ANN. sec. 6.24* (Vernon 1982) and *TEX.REV.CIV.STAT. ANN. art. 4413(32c)* (Vernon 1976), and a copy of said contract was attached to the petition.

The terms of the contract were in conformity and in accordance with the requirements of *TEX.TAX CODE ANN. sec. 6.23* (Vernon 1982) whereby Lampson, acting as Tax Collector for the School District, would collect the ad valorem property taxes and would perform all duties relating to the collection of said taxes. The intergovernmental contract set out in detail its purpose, term, the services to be performed, and the remittance of collections.

## THE COURT PROCEEDINGS

The court set hearings in the matter, which were postponed on two occasions. On January 10, 1984, the hearing took place. On that date the court entered its order *based on a stipulation agreed upon by counsel for defendants. The stipulation unequivocally admitted failure to perform certain duties required under the valid and binding intergovernmental contract dated September 8, 1982.* The stipulation also read that these *failures, in substance, caused "manifest injury to plaintiff school district" and that the school district had performed in accordance with the contract.* The stipulation also set forth that the defendants were diligently at work to perform all of the duties, which were intended to be completed within 30 days from the date of the stipulation.

However, we note that the stipulation averred that the defendants did not concede that the "Court has jurisdiction" to order the issuance of a writ of mandamus.

The trial court's order (prior to the mandamus) was explicit and expertly drafted. The order commanded the tax assessor-col-

lector, the county judge and all the commissioners, and the county auditor, to perform virtually all of the acts as set forth in the stipulation by February 13, 1984, at 9:00 o'clock A.M. The defendants were ordered to appear before the court and state how each defendant had executed the duties and complied with the trial court's order. On February 13, 1984, the court granted an extension, allowing the defendants until February 27th to comply.

It must be borne in mind that the Beaumont Independent School District was abolished on August 13, 1983, by election, and the territories annexed to the South Park Independent School District by action of the Commissioners Court on August 15, 1983, in accordance with *TEX.EDUC. CODE ANN. sec. 19.366* (Vernon 1972). Hence, the South Park Independent School District became the successor in interest and in law to the former Beaumont Independent School District pursuant to *TEX. EDUC.CODE ANN. sec. 19.368* (Vernon 1972).

According to the contract, the Tax Assessor-Collector (Appellant), was designated as the tax assessor-collector for the school district and was to perform all the duties required by law.

In *TEX.TAX CODE ANN. sec. 6.22* (Vernon 1982) we find:

"(a) The assessor and collector for a taxing unit other than a county or a home-rule city are determined by the law creating or authorizing creation of the unit.

. . . .

"(c) The governing body of a taxing unit authorized to have its own assessor and collector by official action in the manner required by law for official action by the body *may require the county to assess and collect the taxes the unit imposes in the county in the manner in which the county assesses and collects its taxes.* The governing body of the unit may revoke the requirement at any time by the same official action."

■ This relevant subsection mandates that the County Judge and the County Commissioners are necessary parties and undoubtedly proper parties to this suit. It was error on the part of the trial judge to dismiss them as parties. Nevertheless, this error does not vitiate or set aside the effectiveness and efficaciousness of the writ of mandamus. It was not reversible error. See also *TEX.EDUC.CODE ANN. sec. 23.93* (Vernon 1972).

We reiterate—the contract itself specifically and affirmatively provides that the contract was entered into pursuant to *TEX.TAX CODE ANN. sec. 6.24* (Vernon 1982) and *TEX.REV.CIV.STAT.ANN. art. 4413(32c)* (Vernon 1976). Also relevant, and we think of crucial effect, is *TEX.TAX CODE ANN. sec. 6.23* (Vernon 1982 and Vernon Supp.1985), the "Duties of Assessor Collector".

"(a) The county assessor-collector shall assess and collect taxes on property in the county for . . . the county. He shall also assess and collect taxes on property for another taxing unit if:

. . . .

"(4) *required by an intergovernmental contract."* (Emphasis added)

*TEX.REV.CIV.STAT.ANN. art. 4413(32c)*, entitled

"Interlocal Cooperation Act", sets out its purpose as:

"Section 1. It is the purpose of this Act *to improve the efficiency and effectiveness of local governments by authorizing the fullest possible range of intergovernmental contracting authority at the local level* including contracts between counties and cities, between and among counties, between and among cities, between and among school districts, and between and among counties, cities, school districts, and other political subdivisions of the state, and agencies of the state." (Emphasis added)

The statute based, valid, intergovernmental contract went into effect on September 1, 1982, although it was dated September 8, 1982. After carefully reading the contract, Chapter 6 of the Texas Property Tax Code,

*Sections 6.23* and *6.24,* and the stipulation, (coupled with part performance by Lampson), the legal conclusion is inescapable that the tax collector had to perform all of the duties, functions, obligations and burdens under the court's orders and writ of mandamus.

The trial court found that Lampson's failure to perform such non-discretionary "ministerial" duties as specifically described in the contract constituted, in law, a refusal because of his "unreasonable delay". Also, the school district had suffered irreparable harm by such failure and refusal. Hence, this harm could not be redressed adequately and realistically by any remedy other than mandamus. Additionally, Lampson's failure to comply with the court's orders, which had been extended to February 27, 1984, was contemptuous and contumacious. The court assessed a penalty of $10 per day until Lampson had fully complied with the orders. As of the date of oral argument to this court, the duties set forth in the mandamus had not been performed; nor have they to this date, according to our record.

Appellant advances the argument that mandamus is an unavailable remedy because those duties for which mandamus was sought involved the exercise of discretion. Appellee argued that the mandamus was brought to compel performance of the statutorily mandated duties under the intergovernmental contract in accordance with *TEX.CONST. art. V, sec. 8* (1891, amended 1973) and *TEX.REV.CIV.STAT. ANN. art. 1914* (Vernon 1964).

The appellant advances and argues that mandamus simply will not lie against him because the statutory duties that were imposed upon him either by the statutes or by the contract, and which have not been performed, were discretionary judgmental and judicial in nature.

We find *TEX.TAX CODE ANN. sec. 26.-04* (Vernon 1982 and Vernon Supp.1985) is relevant. That section repeatedly uses the word "shall" in its most authoritative and commanding sense pertaining to the duties of the collector, which we find demonstrates the legislative intention to have been lucidly mandatory.

■ But, in addition to the mandatory provisions of the statutes and the contract, we are faced with the compelling stipulation. We sanguinely, squarely hold that all the statutory duties and the duties imposed upon the tax assessor-collector by the sovereign, paramount, intergovernmental contract, as well as those provided for in the crucial stipulation, are ministerial and non-discretionary.

■ Appellant advances the argument that the mandamus will not lie because the only proper action would be for money damages for breach of contract. Appellee meets this argument by saying that breach of contract suit for money damages, would not supply the district with the necessary tax rolls, both current and delinquent. Nor would money damages bring forward the other materials necessary for the district to comply with a proper audit which is required of school districts to be made within 120 days following the end of the fiscal year. This is necessary to obtain full accreditation by the Texas Education Agency pursuant to *TEX.EDUC.CODE ANN. sec. 23.50* (Vernon 1972).

It is important to stress that at no time during the trial did any of the parties take the position that the required materials, data and rolls were impossible to prepare or complete. Indeed, from the stipulation and from the thrust of the verbal testimony in this case, it was represented to the trial court that all these matters could be finished in accurate form and in conformity with statutory obligations and duties as well as in compliance with the contract but that more time was needed.

Appellant emphasizes *Burke v. Hutcheson,* 537 S.W.2d 312 (Tex.Civ.App.—Eastland 1976, writ ref'd n.r.e.). We find *Burke, supra,* meaningfully different on the facts and on the law. There, Burke sought a writ of mandamus against Hutcheson, as County Clerk of Taylor County to certify to the Commissioners Court of Taylor County the results of her

count of signatures on a petition seeking to call a local optional election for the City of Abilene. The local option election concerned the sale of alcoholic beverages within the city limits of Abilene. Burke had the burden of demonstrating clearly and unequivocally his right to compel Mrs. Hutcheson, the County Clerk, to perform a purely ministerial act as distinguished from a discretionary act before he was entitled to the writ of mandamus. There, the court cited *Cobra Oil & Gas Corporation v. Sadler*, 447 S.W.2d 887 (Tex.1968), quoting as follows, at page 313:

"... 'It is elementary law that mandamus will not issue to compel a public official to perform an official act unless it is made to appear to the court that the relator's right to have the act performed is clear.' [Omitting numerous cited cases]"

In the *Burke* case, *supra*, the City of Abilene lay, in part, in Taylor County and lay, in part, in Jones County. The court held that the one county commissioners court had no jurisdiction beyond the limits of its own county, citing *TEX.CONST. art. V, sec. 18*, saying at page 314:

"Texas courts have held that where the Liquor Control Act failed to provide methods and machinery for holding a local option election in an incorporated city or town geographically located in two counties, the county commissioner's court of one county was without authority or power to order and direct a local option election in a city lying partly in two counties. *Ellis v. Hanks*, 478 S.W.2d 172 (Tex.Civ.App.—Dallas 1972, writ ref. n.r.e.); *Greggs v. Faulk*, 343 S.W.2d 543 (Tex.Civ.App.—Fort Worth 1961, no writ).

"There is no clear statutory authority for the officials of Taylor County to order a local option election for the City of Abilene, *a portion of which lies in Taylor County and a portion of which lies in Jones County. The certification requested by appellant would be a useless act on the part of the clerk.* The application for the writ of mandamus was

properly denied. It is stated in *Ellis v. Hanks, supra:*

" '... our Supreme Court in *Manion v. Lockhart*, 131 Tex. 175, 114 S.W.2d 216, 219 (1938), said that the law is well settled that a writ of mandamus will not *issue where the issuance of such writ would be fruitless or futile.* More recently the same rule was reiterated in *Parks v. Elliott*, 465 S.W.2d 434 (Tex.Civ.App., Houston (14th Dist.) 1971).' " (Emphasis added, lines 3–7, second paragraph and lines 5–6, third paragraph)

Appellant also cites *Forbes v. City of Houston*, 356 S.W.2d 709 (Tex.Civ.App.—Houston 1962, no writ). In *Forbes, supra,* the court wrote at page 711:

"In order for an action of the city council to be subject to mandamus, the act *must be a ministerial act or, if discretionary, there must have been a clear case of abuse of discretion. Stone v. City of Wylie*, Tex.Com.App.1931, 34 S.W.2d 842. 'An act is said to be ministerial where the law clearly spells out the *duty to be performed by an official* and does so with such certainty that nothing is left to the exercise of discretion or judgment.' Yokley, Municipal Corporations, Vol. 4, p. 4, sec. 593(b); 55 C.J.S. Mandamus sec. 63, p. 100, and authorities cited." (Emphasis added)

In *Forbes, supra,* the writ of mandamus was to require city council to enact and enforce an ordinance. The ordinance in question had to be considered as a whole. The court wrote, at pages 711–712:

"Section 1 of the ordinance ordains that 'in the event said conditions are not remedied, the Council *may hereafter determine* that portions of said streets shall be closed.' (Emphasis supplied). Section 3 of the ordinance does not state what kind of an investigation shall be made, or the nature or extent thereof, or how and in what manner it will be made. *Much is left to the exercise of discretion and judgment on the part of the Council, and for such reason the act is not to be deemed merely ministerial.* 55

C.J.S. Mandamus, Sec. 63, p. 101. It also ordains that if deemed advisable an investigation shall also be made by certain Directors and the Chief of Police. It is *manifest that the Council did not deem it advisable* for such directors to make an investigation since none was made.

"The ordinance in question was passed by the City Council in the exercise of its legislative powers as an expression of intent with respect to the performance of future acts by the City Council. *The Council could repeal it at any time in the exercise of its discretion and legislative powers,* and its rescission would render the issuance of a writ of mandamus useless and unavailing. *Holcombe v. Fowler,* 118 Tex. 42, 9 S.W.2d 1028." (Emphasis added, lines 9–12, 16–17, first paragraph and lines 5–6, second paragraph)

In essence, the writ was denied because an effort was being made to force the *City Council to perform a legislative function which was clearly an exercise of its discretionary or governmental powers. Forbes, supra,* is not controlling of the case subjudice.

Appellant, in his brief, says: "Appellant cannot claim that it is not within his discretion to perform those duties imposed upon him by the Property Tax Code and the intergovernmental contract, but he can certainly claim that the manner in which those duties are performed involve discretion." We agree that there might have been some discretion as to the scheduling of the work and as to the assigning of the various personnel to perform the work but the *ultimate duties imposed upon the tax collector were clear, mandatory duties and had to be performed.* The Legislature had so dictated.

Appellant also cites *Depoyster v. Baker,* 89 Tex. 155, 34 S.W. 106 (1896). There, the Supreme Court held that when a purchaser upon proper proof showed that money had been paid in good faith to the State for lands on which patents could not lawfully issue, then the controller *shall issue* his warrant for the amount so paid in favor of the party who had in good faith actually paid it. This authority did not extend to permit a recovery by a second purchaser or second assignee from such original buyer. By the explicit terms of the statute, the first parties *who paid the money to the State in good faith* are those entitled to have it returned to them—no one else. The statute simply did not include buyers from, or assignees from, the original party who actually *paid the money in good faith directly to the State.* In *Depoyster, supra,* the plaintiff was not a party who paid money in good faith directly to the State. Therefore, plaintiff, Depoyster, was not entitled to receive the money from the State and had no right to demand the certificate from the Commissioner of the General Land Office. The Supreme Court states, 34 S.W. at page 107:

"It is a general rule of law, often asserted by this court, 'that a writ of mandamus will not issue against a public officer, unless it be to compel the performance of an act clearly enjoined upon him by law, which is ministerial in its character, and neither involves the exercise of discretion nor leaves any alternatives.' *Arberry v. Beavers,* 6 Tex. 465, [457] and cases cited; *Railway Co. v. Randolph,* 24 Tex. [317] 329; *Bledsoe v. Railroad Co.,* 40 Tex. 557; *Decatur v. Paulding,* 14 Pet. 497 [10 L.Ed. 559]. In the case of *Commissioner v. Smith,* 5 Tex. [471] 479, Judge Wheeler said: 'The distinction between ministerial and judicial and other official acts seems to be that, *where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment,* the act is ministerial; but where the act to be done involves the exercise of discretion or judgment in determining where the duty exists, it is not to be deemed merely ministerial.'" (Emphasis added)

We find the tax collector had no discretion nor judicial function to determine whether or not *he would perform his duty and furnish and produce the statutorily re-*

quired and contracted for tax rolls, materials, and data.

*Parrish v. Wright,* 293 S.W. 659 (Tex. Civ.App.—Amarillo 1927, writ ref'd), states:

"As said in Ferris 'Extraordinary Legal Remedies,' secs. 206 and 207:

"'A ministerial act is one which a person performs in a given state of facts and in a prescribed manner in obedience to the method of legal authority, *without regard to his own judgment on the propriety of the act being done.* The distinction between ministerial and judicial and other official acts is that, where the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial; but, where the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not to be deemed ministerial. Although mandamus is the appropriate remedy to compel the performance of a duty which is plain, positive, and ministerial in character and clearly imposed by law, *it does not necessarily follow merely because the duty is discretionary or that the element of discretion exists in part, that mandamus will not lie.* The correct rule is that mandamus will not lie where the duty is clearly discretionary and the party upon whom the duty rests has exercised his discretion reasonably and within his jurisdiction; that is, upon facts sufficient to support his action. "'It is well settled that mandamus may properly be invoked to compel a reasonable exercise of official discretion where there is a failure or refusal to perform such duty resulting from an office, trust or station; that is, an officer may be compelled to act so far as is necessary to an actual exercise of his judgment or discretion in determining whether he ought to do or refrain from doing that which petitioner desires. Even though an officer have discretion, he cannot simply fold his hands and refuse to do anything....'"* (Emphasis added)

The approval and imprimitur of the Supreme Court attached to *Parrish, supra,* by the "writ refused" notation. Therefore, we find the true rule was announced when it was said that "mandamus may properly be invoked to compel a reasonable exercise of official discretion where there is a failure *or* refusal to perform such duty resulting from an office, trust or station." *See Arberry v. Beavers,* 6 Tex. 457 (1851). With sagacity, we find that Lampson did not refuse to perform the contract but this does not reverse the judgment nor vitiate, to any degree, the writ of mandamus.

## THE TRIAL JUDGE'S DUTIES AND POWERS

The district judge heard and observed the witnesses. His duty was to weigh the evidence. The only two witnesses were not favorable to Appellant. We observe in *Forbes, supra,* that:

"Appellate courts are reluctant to *disturb discretion exercised by lower court* in granting or refusing award of writ of mandamus." (Emphasis added)

The trial judge had the realistic opportunity to observe the behavior, demeanor and actions of the witnesses before him. He was in a much better position to weigh their credibility. Under our law we are not to substitute our judgment for the trial court's judgment under this record.

It must be remembered that in the stipulation dated January 10, 1984, the Appellant acknowledged that he had, in substance, "failed thus far and timely to perform" certain duties, all of which were set out in detail in the stipulation itself and which were also set out in detail in the intergovernmental contract. The stipulation contained words to the effect that the Appellant was diligently working in an effort to perform all the aforesaid duties. It was represented to the trial court that his work was approximately 90% complete and would, or should, be forthcoming either shortly or within a reasonable time. The

trial judge found the time factors against Appellant.

■ Secondly, the Appellant urges that the trial court erred in overruling Appellant's motion for dismissal of the writ of mandamus because the Appellant has never *refused* to perform the duties for which the appellee herein has sought and obtained a mandamus. The record clearly shows that the appellee has received large amounts of tax money pursuant to the contract approximating $12,000,000. The county auditor stated the tax office had put forth real effort to get the information, materials and tax rolls completed. In fact, the auditor testified that there had been a "rather feverish pitch to comply with the contract." It is true that the Appellant has not verbally said, unequivocally, something to the effect that "I won't" or "I refuse" to perform these duties.

We would be remiss if we did not state that we think the record shows that the collector has made Herculean efforts. Apparently, he has cut some of the Gordian knots and cleaned at least a portion of the Augean stables, but the final product has not been produced. We credit Lampson with making extraordinary efforts to perform his duties, but they have not been completed. We hold that either *failure or refusal* to perform the statutory and contractual duties would properly permit the writ of mandamus to lie. *See Parrish, supra* and *Arberry, supra.*

We disagree with Appellant's reasoning in regard to *Houston & T.C.R. Co. v. Collins,* 272 S.W. 219 (Tex.Civ.App.—Waco 1925, no writ). There the court refused to mandamus a court reporter to prepare a narrative statement of facts when the reporter had lost *all of his shorthand notes and a true, absolute impossibility existed* preventing the reporter from preparing a statement of facts. In the case at bar, there is no showing that the basic factual material has been irretrievably lost and, therefore, the collector cannot perform his duties. The thrust of the Appellant's position at trial was that he was making feverish and diligent efforts to complete these materials and rolls and could do so within a reasonable time. The tax collector has never taken the position—certainly not at the trial level—that he had lost all the basic data and material.

Next, the Appellant argues that it was error to issue the mandamus because the writ is an extraordinary remedy. Also, the district had a more appropriate and adequate remedy at law. The main thrust of his argument is that since the Appellant had partially performed under the governmental contract the remedy should be solely for breach of contract. The answer to this contention is that a money damage award would not produce the desired result, being the delivery of the requisite tax data.

■ A suit based on breach of contract is not an adequate remedy. We so hold. Furthermore, breach of contract suit, standing alone, cannot actually require or compel a public official to perform his statutory duties or his contractual duties.

A well-reasoned case is *Laidlaw Bros. v. Marrs,* 114 Tex. 561, 273 S.W. 789 (1925). In *Laidlaw Bros.,* a writ of mandamus was issued compelling the performance of a contract for the purchase of certain public school text books. The Supreme Court affirmed the issuance of the mandamus and wrote, 273 S.W. at page 792:

"[T]he fact that the performance of a ministerial act required by law results in the performance of a contract is no reason why it [the writ of mandamus] will not issue. The effect it may have upon the performance of a contract is incidental, provided the right under the law exists for its issuance."

Indeed, we find the *Laidlaw Bros. case, supra,* is authority and precedent for the issuance of the writ of mandamus in this case. The Supreme Court of Texas wrote, 273 S.W. at page 792:

"The action of the board of education on January 12th on relator's contract gave rise to *respondent's duties regarding it.* The acts to be performed by respondent are required by law, and are

ministerial, as was held in *American Book Co. v. Marrs*, 113 Tex. 291, 253 S.W. 817, and *Charles Scribner's Sons v. Marrs* (Tex.Sup.) [114 Tex. 11], 262 S.W. 722. Being required by law and being ministerial, mandamus will lie to compel their performance." (Emphasis added)

█ The fact that the performance of a ministerial act required by law results in the performance of a contract is no reason why that writ of mandamus will not properly lie. We, therefore, overrule Point of Error No. Three.

In the last error advanced and urged by Appellant, the gravamen is that Jerry Ware, the County Auditor; Richard Le-Blanc, Jr., the County Judge; Norman Troy, Dave Smith, Jr., Rolfe Christopher, and Jim Smith, Jefferson County Commissioners, are all necessary parties.

We have carefully examined the contract in question and find that the Commissioners Court (except one commissioner) and the County Judge are the signatories thereto. We perceive they are proper parties and we sustain Point of Error Four; however, this does not reverse the case nor vitiate the writ of mandamus.

## THE PROCEDURAL POSTURE OF THE CASE

Procedurally, since no findings of fact or conclusions of law were requested and none were filed, then under any phase, version or interpretation of the evidence that the trial court believed and under any proper theory of law, the granting of the writ of mandamus, being within his discretion, would properly lie. The state of this record is such that we do not know and cannot ascertain which facts the trial judge found credible and established by a preponderance of the evidence. Nor are we able to determine on which theories and conclusions of law he based the writ of mandamus.

The dissent cites five cases and bases its logic and reasoning thereon. They are: *Espinoza v. State*, 653 S.W.2d 446 (Tex. App.—San Antonio 1982), aff'd 669 S.W.2d 736 (Tex.Crim.App.1984); *Dula v. Bush*,

136 S.W.2d 898 (Tex.Civ.App.—Dallas 1939, no writ); *Gonzales v. Stevens*, 427 S.W.2d 694 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n.r.e.); *Wolff v. Thornton*, 676 S.W.2d 128 (Tex.Crim.App.1984) and *Stringer v. Franklin County*, 58 Tex.Civ. App. 343, 123 S.W. 1168 (1909, no writ).

The *Espinoza, supra*, case is a criminal appeal. There, the defendant was petitioning for mandamus requesting the State to furnish him with copies of the records regarding the prior criminal jury service of the prospective jurors in his case. On the basic facts, *Espinoza, supra*, is different. Even so, *Espinoza, supra*, reads:

"Ordinarily, a writ of mandamus must be the last resort and will be refused if there is another remedy which is effective and complete. *Gonzales v. Stevens*, 427 S.W.2d 694, 702 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n.r.e.). *The other remedy must be as convenient, beneficial and effective as the remedy of mandamus. Simpson v. Williams Rural High School District*, 153 S.W.2d 852, 856 (Tex.Civ.App.—Amarillo 1941, writ ref'd). *An appellate court will not reverse a refusal of a trial court to grant a writ of mandamus unless it is made to appear that the trial court abused its discretion in denying the writ. Alice National Bank v. Edward*, 408 S.W.2d 307, 311 (Tex.Civ.App.—Corpus Christi 1966, no writ)...." (Except for cases cited, emphasis ours)

Appellant has not shown in this record that a suit for an award of money damages, based on breach of contract, would be as effective and complete, convenient and beneficial as the remedy of mandamus.

*Dula, supra*, is not controlling. It simply stands for the proposition that a writ of mandamus is not available where the applicant has an equally effective and adequate remedy by appeal or writ of error. The defendants filed a motion to set aside an order or judgment overruling their plea of privilege. The motion embraced the essential elements of an equitable bill of review. The judgment was set aside. Then the plea

was set for a hearing on its merits and the plea of privilege was finally granted. A transfer of the cause was effected. Thereafter, the plaintiff was not entitled to a writ of mandamus. The court held the plaintiff should have prosecuted an appeal from the order sustaining the plea of privilege. The essence of *Dula, supra,* and certainly the procedural posture of *Dula, supra,* is vastly different from our case subjudice.

*Gonzales, supra,* was a voter registration case. There, the registrar of voters was held to be without authority to accept registration applications from an intermediary who was unrelated to the applicants for voter registration certificates. The court cited *TEX. ELECTION CODE ANN. art. 5.13a* (Vernon 1967). The appellants in *Gonzales, supra,* attempted to obtain a mandamus when they had an adequate right of appeal. In fact, a statute directed that relief was to be by appeal; hence, mandamus could not take the place of a statutory appeal. The writ of mandamus in our case was issued by the trial court. *Gonzales, supra,* is not parallel and is meaningfully different and distinguishable.

The *Wolff v. Thornton, supra,* case is not persuasive. There, the petitioner, asking for both a writ of mandamus and prohibition, had been charged with the offense of driving while intoxicated. The Court of Criminal Appeals held that the petitioner was not entitled to a writ of mandamus or prohibition to compel a county court judge to transfer the petitioner's case to a district court in order that it could be tried in a court presided over by a judge who was a licensed lawyer. The petitioner had failed to point out any reason why his contention could not be adequately determined on an appeal. Further, the record made by the petitioner did not demonstrate a reason for the transfer. Arguably, *Wolff, supra,* supports appellee's position rather than Appellant's. This Appellant was tried before an experienced district judge, a licensed lawyer.

We find *Stringer, supra,* is supportive of appellee's contentions; the court, in *Stringer, supra,* wrote at 1172:

"If the law imposed the duty, then why require the commissioners' court to cause him [the tax collector] to do it? We think the purpose of the statute was to empower the commissioners' courts of the different counties to require this work to be done by the tax collector, *for the reason that the records from which the data were to be collected were mainly in his custody, and naturally he would be the person who could most conveniently and accurately compile it.*
. . ."

It is correct that Appellant did collect large amounts of taxes due to the school district. But the gravamen of the school district's complaint was that it did not know at the time it received taxes—and, apparently, does not know as of this date— whether or not the amount of taxes delivered to it is or was correct. We find in the record:

"Q    Based on years past experience, several years past, and with your knowledge of the district over which you have overseen financial affairs for some eighteen years, you could make a pretty educated guess about how much of that is yours, couldn't you, really?

"A    No, sir. At one time they sent us three hundred and something thousand dollars more and asked for that money back.

"Q    Did you give it back to them?

"A    Yes, sir."

This testimony was uncontradicted and uncontroverted in the record, having been sworn to by Thomas Jones. Jones further swore, in substance, that concerning one roll:

"A    . . . 'The total reflected in the roll is $1,449,738.52 out of balance with a previous report furnished by you of delinquent taxes delivered to you by the Beaumont Consolidated Tax Agency. The previous report, delivered to the school district on August 29, 1983, was certified by the district and was recon-

ciled to audited information furnished to the district by the Beaumont Consolidated Tax Agency.' It's out of balance, a million and a half dollars.

"Q So it is inaccurate on its face, isn't it?

"A Yes, sir. Not on its face; it's inaccurate as compared, too."

These substantial differences and inaccuracies, among many others, were also major complaints of the school district.

Lastly, the dissent maintains:

"... the School District has specifically reserved 'the right to examine or audit the tax records of the county at its own expense'.[1]" [Paragraph VII (5) of the contract]

The cited paragraph 5 starts with these words: "In addition to the audit provided in paragraph 4 above, the District reserves ...", followed by the words used in the dissent: "'the right to examine or audit the tax records of the county at its own expense'". Since paragraph 5 refers to the audit provided for in paragraph 4, we are compelled to recite paragraph 4:

"There shall be an annual independent audit of the assessor-collector's accounts performed on behalf of the District by an auditor not regularly employed by the District or the County. Ten copies of the same shall be furnished to the District. Costs of such audit and copies thereof shall be paid exclusively by District."

It is abundantly clear in this record that there can be no annual independent audit of the assessor-collector's accounts performed on behalf of the District for the very simple reason that, under this record, the materials and data furnished to the District are not in an auditable form.

It should be stressed that the parties entered into the primary contract pursuant to *TEX.REV.CIV.STAT.ANN. art. 4413(32c)* (Vernon 1979 [sic]—(Vernon 1976 and Vernon Supp.1985). *Section 1* thereof reads:

"It is the purpose of this Act to improve the efficiency and effectiveness of local governments by authorizing the fullest possible range of intergovernmental contracting authority at the local level including contracts between counties and cities, between and among counties, between and among cities, between and among school districts, and between and among counties, cities, school districts, and other political subdivisions of the state, and agencies of the state."

Nothing herein precludes the District from suing for damages for breach of contract and for an award of money damages on the theory of breach of contract if the said cause of action is otherwise still available.

We are constrained to affirm. We cannot reverse. We cannot substitute our opinion on the facts. We easily perceive several conclusions or applications of law which would amply support the granting of mandamus.

In summary, we overrule Appellant's Point of Error I which contended that the duties for which the mandamus was originally sought involved the exercise of discretion. We hold the duties were mandatory and nondiscretionary.

We overrule Point of Error III which contended that the appellee had a more appropriate and adequate remedy at law. We squarely hold, under this record, that a suit for money damages, based on a breach of contract, is not more appropriate and is not an adequate remedy at law.

We sustain Appellant's Point of Error II. We agree that the Appellant has never refused to perform these duties. We hold that the Appellant's failure to perform these duties is a solid basis for granting the writ of mandamus.

We also sustain Appellant's Point of Error IV to the extent that we hold the County Judge and the County Commissioners are necessary and proper parties since they signed the contract.

However, our sustaining Points of Error II and IV does not, under this record, reverse the judgment of the trial court nor does our decision vitiate or diminish to any degree the writ of mandamus.

AFFIRMED.

BURGESS, Justice, dissenting.

I concur in certain aspects of the majority's opinion, but respectfully dissent in others. I concur with the majority in sustaining appellant's points of error numbers two and four. I do not agree with the majority in overruling points of error numbers one and three and with the affirmance of the trial court.

While I do not question most of the basic legal theories relied upon by the majority, I view the legal implications of the original contract somewhat differently. I find sound authority that mandamus will not lie when there is an adequate remedy at law. Mandamus is an extraordinary remedy and issues only when the party has a right to have something done and has no other way of compelling its performance. *Espinoza v. State,* 653 S.W.2d 446 (Tex.App.—San Antonio 1982) *aff'd,* 669 S.W.2d 736 (Tex. Crim.App.1984); *Dula v. Bush,* 136 S.W.2d 898 (Tex.Civ.App.—Dallas 1939, no writ). A writ of mandamus must be the last resort and will be refused if there is another remedy which is effective and complete. *Espinoza, supra; Gonzales v. Stevens,* 427 S.W.2d 694 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n.r.e.). Our highest criminal court has stated: "It is axiomatic that actions seeking writs of prohibition and mandamus are extraordinary and those writs are available only to parties illustrating clearly they have no other adequate remedy at law." *Wolff v. Thornton,* 676 S.W.2d 128 (Tex.Crim.App.1984).

When looking at the existence of an alternate remedy, one needs to closely examine what the litigation was all about. The complaint of the school district was not that the tax-assessor collector was failing to collect the taxes due the district. This is a governmental ministerial duty only he can perform. *Stringer v. Franklin County,* 58 Tex.Civ.App. 343, 123 S.W. 1168 (1909, no writ). Failure to do this would be a proper complaint in an application for a writ of mandamus. Here the district was seeking to have the tax assessor-collector perform all the duties the county had contracted to perform. True, some of these duties were statutory, but some were not. The order of the trial court did nothing more than order the tax-assessor to perform those items he had stipulated he had not performed. While mandamus was certainly available as to some of the duties, it was not available to all.

In this instance, the School District had specifically reserved "the right to examine or audit the tax records of the county at its own expense".[1] Mandamus should not be available to one who possesses both the ability and the right to do what he seeks to have done through mandamus. An action for breach of contract, even if an anticipatory breach, was another appropriate alternate remedy and another reason mandamus should not lie. I would reverse the trial court and dismiss the writ of mandamus and contempt order.

---

1. Paragraph VII (5) of the contract.